1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF PUERTO RICO

**SARITZA ROSADO,**

>   **Plaintiff,**

>   **v.**                                    **Civil No. 08-2264 (GAG)**

**FONDO DEL SEGURO DEL ESTADO, et al.,**

>   **Defendants.**

### OPINION AND ORDER

Plaintiff Saritza Rosado ("Plaintiff") brings this action alleging discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq*.; the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*; and Title I of the Civil Rights Act, 42 U.S.C. § 1981a. Plaintiff also brings state claims alleging violations of Puerto Rico Law 44 of July 2, 1985, P.R. Laws Ann. tit 1 § 501 *et seq.* ("Law 44"); Puerto Rico Law No. 69 of July 6, 1985, P.R. Laws Ann. tit. 29, § 1321, *et seq.* ("Law 69"); Puerto Rico Law No. 100 of June 30, 1959, P.R. Laws Ann. tit. 29, § 146, *et seq.* ("Law 100"); Puerto Rico Law No. 115 of December 20, 1991, P.R. Laws Ann. tit. 29, § 194, *et seq.* ("Law 115"); and Articles 1802 and 1803 of the Civil Code of Puerto Rico ("Articles 1802 and 1803"), P.R. Laws Ann. tit. 31, §§ 5141 and 5142. Plaintiff filed this claim against her employer Fondo del Seguro del Estado ("FSE") on November 5, 2008 (Docket No. 1). Plaintiff's Title VII claim has been voluntarily dismissed (Docket No. 22). Presently before the court is FSE's motion for summary judgment as to all remaining claims (Docket No. 82). Plaintiff opposed the motion (Docket No. 92) and, FSE submitted a reply brief (Docket No. 96). After reviewing these submissions and the pertinent law, the court **GRANTS** FSE's motion at Docket No. 82.

### I.      Standard of Review

Summary judgment is appropriate when, "the pleadings, depositions, answers to

1  **Civil No. 08-2264 (GAG)**                    2

2  interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

3  genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter

4  of law." FED.R.CIV.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "An issue is

5  genuine if 'it may reasonably be resolved in favor of either party' at trial, and material if it

6  'possess[es] the capacity to sway the outcome of the litigation under the applicable law.'" Iverson

7  v. City of Boston, 452 F.3d 94, 98 (1st Cir. 2006) (alteration in original) (citations omitted). The

8  moving party bears the initial burden of demonstrating the lack of evidence to support the non-

9  moving party's case. Celotex, 477 U.S. at 325. "The movant must aver an absence of evidence to

10  support the nonmoving party's case. The burden then shifts to the nonmovant to establish the

11  existence of at least one fact issue which is both genuine and material." Maldonado-Denis v.

12  Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994). The non-moving party must then "set forth

13  specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). If the court finds

14  that a genuine factual issue remains, the resolution of which could affect the outcome of the case,

15  then the court must deny summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

16  248 (1986).

17  When considering a motion for summary judgment, the court must view the evidence in the

18  light most favorable to the non-moving party and give that party the benefit of any and all reasonable

19  inferences. Id. at 255. Moreover, at the summary judgment stage, the court does not make

20  credibility determinations or weigh the evidence. Id. Summary judgment may be appropriate,

21  however, if the non-moving party's case rests merely upon "conclusory allegations, improbable

22  inferences, and unsupported speculation." Forestier Fradera v. Municipality of Mayaguez, 440 F.3d

23  17, 21 (1st Cir. 2006) (quoting Benoit v. Technical Mfg. Corp., 331 F.3d 166, 173 (1st Cir. 2003)).

24  **II.    Relevant Factual & Procedural Background**

25  FSE is the governmental entity that is responsible for administrating the local worker's

26  compensation program. (See Docket No. 82-2 at ¶ 3.) Established by the Workmen's Accident

27  Compensation Act, FSE is responsible for providing medical treatment for employees who suffer

28  work related accidents. (See id. at ¶ 4.) FSE is broken into nine regional offices that provide

**Civil No. 08-2264 (GAG)**                          3

medical services to injured workers. (See id.) Each regional office contains a Multidisciplinary Unit

for Emotional Conditions ("MUEC"). (See id.) Each MUEC consists of a medical director, a

psychiatrist, a psychologist and one or two physicians. (See id.) Plaintiff began working for FSE

on August 12, 1996. (See Docket No. 82-3 at 90, L. 2.) Plaintiff worked in the Emergency Room,

the Intermediate Clinic, spent time rotating through the rest of the clinics, and in 1999 began

working in the MUEC as a Physician II. (See Docket No. 82-4 at 52, L. 10-15; 89, L. 7-14.)

Plaintiff's supervisor while at the MUEC was Carmen Yejo Luquis ("Yejo"). (See Docket No. 82-2

at ¶ 13.) On March 15, 2001, Plaintiff submitted a letter to the director of human resources of FSE

requesting that her position as Physician II be reclassified as a Physician III position. (See Docket

No. 82-4 at 51, L. 22-24.) In connection with this request, Plaintiff stated she had performed the

functions of a Physician II for roughly eighteen months and attached a copy of those duties to her

request. (See Docket No. 91-4.) This request was approved on July 18, 2002 and was retroactively

applied to July 1, 2000. (See Docket No. 91-5.)

### A.    Physician Job Duties

As a physician at the MUEC, Plaintiff's job duties required her to perform medical

evaluations, prescribe medications, record information, file forms, keep statistical data, review and

approve reports amongst a host of other duties. (See Docket No. 91-4.) The duties for Physician

II and Physician III are essentially the same. (See Docket No. 91-3 at 90, L. 14-17.) MUEC

physicians prescribe medication, when necessary, and also perform physical examinations at the

employees' clinic. (See Docket No. 91-2 at 72, L. 20-24; 53, L. 16-24.) These physical evaluations

require the physician to make visual inspections of the patient in order to formulate a diagnosis.

(See Docket Nos. 91-2 at 59, L. 16-22; 91-3 at 116, L. 7-12.) When conducting mental evaluations,

the physician must consider the physical traits of the patient. (See Docket Nos. 96 at ¶ 27; 92-1 at

¶ 27.) Symptoms and signals that may be measured through visual inspection of the patient are:

facial expressions, abnormal involuntary body movements, facial structures with no lesions, edema,

sunken eyes, weight loss, physical appearance, crying, wandering or ambulating with difficulty,

**Civil No. 08-2264 (GAG)**                              4

distraction, blinking of the eyes and adverse side effects of prescription medications.  (See Docket

Nos. 96 at ¶ 32; 92-1 at ¶ 32.)

### B.    Plaintiff's Visual Impairment

Plaintiff was diagnosed with diabetes at the age of thirteen and was further diagnosed with

diabetic retinopathy in 1998.  (See Docket Nos. 96 at ¶ 34; 92-1 at ¶ 34.)  Plaintiff lost all vision in

her right eye following a medical procedure to an injured toe in 2000.  (See Docket Nos. 1 at ¶ 10;

96 at ¶ 35.)  This condition impedes Plaintiff's ability to differentiate whether body parts are

swollen, changes in skin color, or whether drug or alcohol consumption is physically effecting a

person.  (See Docket Nos. 96 at ¶ 36; 92-1 at ¶ 36.)  Because of her condition, Plaintiff cannot

perform physical examinations as a physician.  (See Docket Nos. 96 at ¶ 37; 92-1 at ¶ 37.)

### C.    Reasonable Accommodation Request

On April 2, 2002, Plaintiff requested a reasonable accommodation due to her diabetic

retinopathy, total loss of vision in her right eye, distorted vision in her left eye, high blood pressure

and Diabetes Mellitus Type I.  (See Docket Nos. 96 at ¶ 43; 92-1 at ¶ 43.)  Plaintiff requested the

accommodation because increased stress and blood pressure aggravated her condition.  (See Docket

Nos. 96 at ¶¶ 43-44; 92-1 at ¶¶43-44.)  Plaintiff could no longer suture or examine lower parts of

an injured worker because it affected the pressure in her eye, nor could she read many documents

because of her lack of vision and because it required her to lower her head.  (See id.) Plaintiff also

had difficulty cooking, sweeping, ironing clothes, cleaning furniture, sewing, trimming nails,

matching clothes, and driving long distances.  (See Docket Nos. 96 at ¶ 46; 92-1 at ¶ 46.)  Plaintiff's

accommodation request specifically sought transfer to the MUEC because at the MUEC she would

"not have to perform physical examinations, only mental examinations . . . ."  (See 91-8 at 4.)

Plaintiff contends there were no duties at the MUEC she could not adequately perform.  (See Docket

Nos. 96 at ¶ 49; 92-1 at ¶ 49.)  The request was granted on August 1, 2002, allowing Plaintiff to

remain at the MUEC, but requiring her to "perform all of the essential functions required by said

position including cardiovascular resuscitation (CPR), in exceptional cases."  (See  Docket No. 91-

**Civil No. 08-2264 (GAG)**                              5

9.) The accommodation did not exempt Plaintiff from performing all the essential functions required by the position and Plaintiff could have appealed the accommodation, but chose not to do so.  (See Docket Nos. 96 at ¶ 52; 92-1 at ¶ 52.)

### D.    Further Visual Impairment

In 2004, Plaintiff suffered a loss of vision in her left eye due to a retinal detachment.  (See Docket Nos. 96 at ¶ 55; 92-1 at ¶ 55.)  Plaintiff is completely blind in her right eye and has an at best corrected vision of 20/200 in her left eye.  (See Docket Nos. 96 at ¶ 56; 92-1 at ¶ 56.)  Plaintiff was evaluated by Dr. Carmen Suarez Castro ("Dr. Suarez"), a low vision specialist on July 17, 2003, October 5, 2006, and September 12, 2008.  (See Docket No. 91-3 at 94, L. 7-13.)  These evaluations were not submitted to FSE because Plaintiff decided to pay for the visual aids herself in order to retain ownership over the aids.  (See id. at 95, L. 12-22.)  Dr. Suarez recommended that Plaintiff use bifocal glasses, a variety of magnifiers, closed circuit television and possibly an assistant for handwritten text. (See Docket No. 91-10.)  However, Plaintiff never disclosed the recommendations to FSE.  (See Docket Nos. 96 at ¶¶ 60-61; 92-1 at ¶¶ 60-61.)  FSE declined her requested accommodation to be placed at MUEC because at the time of the request, she was already placed there. See id.  Yejo opposed Plaintiff's request, but did not state the reasons for her opposition. (See Docket Nos. 96 at ¶ 62; 92-1 at ¶ 62.)

### E.    Heredia Deposition Testimony

Around June or July of 2006, Plaintiff gave deposition testimony in the matter of Torres Heredia v. Nicolas Lopez Pena, et al. ("Heredia Case"), a case involving protests by unionized physicians against Yejo. (See Docket Nos. 96 at ¶ 63; 92-1 at ¶ 63.)  Yejo, one of the plaintiffs in that case, claimed she had been discriminated against for political reasons and that the protests against her were sponsored by FSE.  (See Docket Nos. 96 at ¶ 64; 92-1 at ¶ 64.)  Plaintiff's testimony in the Heredia Case contradicted Yejo's claim that FSE sponsored the protests and generally discussed Yejo's hostile workplace demeanor. (See Docket Nos. 96 at ¶ 65; 92-1 at ¶ 65.)

### F.    Alleged Retaliatory Acts

Five to ten months after giving this testimony, Plaintiff claims Yejo retaliated against her

**Civil No. 08-2264 (GAG)**                         6

because her testimony was detrimental to Yejo's case. (See Docket Nos. 96 at ¶¶ 66-67; 92-1 at ¶¶ 66-67.) Plaintiff lists a series of alleged violations of her reasonable accommodation to prove Yejo retaliated against her. These events, occurring in December 2006 or January 2007 and April 2007, include covering shifts at the employees clinic, filling out forms previously not required, performing physical examinations and relocation to medical control. (See Docket Nos. 96 at ¶¶ 68-69; 92-1 at ¶¶ 68-69.) By the end of 2006, Yejo required Plaintiff to perform all these functions. (See Docket Nos. 96 at ¶ 76; 92-1 at ¶ 76.) On or around April 2007, Plaintiff was relocated to medical control, a move Plaintiff questioned at the time. (See Docket Nos. 96 at ¶ 77; 92-1 at 77.) Plaintiff worked at medical control for one day, in which she was required to perform two to three physical examinations, read resolutions, reopen cases, and justify absences. (See Docket Nos. 96 at ¶ 79; 92-1 at ¶ 79.) Plaintiff reported back to the MUEC after she complained to FSE Executive Director Silvia Abreu Rodriguez about the transfer. (See Docket Nos. 96 at ¶ 109; 92-1 at ¶ 109.) Plaintiff believes she was transferred to medical control in retaliation for her testimony against Yejo in the Heredia Case. (See Docket No. 91-2 at 83, L. 7-10.)

At some point either earlier or between 2007 and 2009, Plaintiff began to receive written reprimands she felt were undeserved. (See Docket No. 96 at ¶¶ 81-82; 92-1 at ¶¶ 81-82.) These disagreements often regarded whether a case was primarily an emotional case or secondarily an emotional case. (See id.) Plaintiff claims Yejo was hostile in her demeanor, stating that Yejo would not listen to her or would swiftly answer her questions, disagree with respect to Plaintiff's interpretation of the collective bargaining agreement, question or ask Plaintiff to change her medical decisions, and asked her to discharge injured workers due to monetary issues. (See Docket Nos. 96 at ¶ 84; 92-1 at ¶ 84.) However, Plaintiff admits that Yejo was equally hostile towards all physicians. (See Docket Nos. 96 at ¶ 83; 92-1 at ¶ 83.) Plaintiff is unsure if Yejo asked other physicians to change their medical decisions. (See Docket Nos. 96 at ¶ 86; 92-1 at ¶ 86.) Additional acts of retaliation include denial of continued education courses and filing of complaints by patients in Plaintiff's file. (See Docket Nos. 96 at ¶¶ 87-88; 92-1 at ¶¶ 87-88.)

      **G.     Plaintiff's EEOC Charge**

**Civil No. 08-2264 (GAG)**                              7

On April 2, 2007, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") claiming she was discriminated against due to her disability. (See Docket Nos. 96 at ¶¶ 91-92; 92-1 at ¶¶ 91-92.)  While the EEOC charge only mentions discrimination based on disability, Plaintiff claims the EEOC officer who assisted her in filling out the form mistakenly did not include her retaliation claim. (See Docket Nos. 96 at ¶ 93; 92-1 at ¶ 93.) During mediation of the EEOC claim, Yejo questioned whether Plaintiff was qualified or not to carry out the duties of a physician and raised the issue of whether Plaintiff should visit an expert to decide if she could perform her duties. (See Docket No. 91-3 at 76, L. 10-21.)  Plaintiff agreed that such a concern was valid, even if the conclusion was not correct. (See id. at 77, L. 7-8.)  On September 10, 2008, the EEOC issued a right to sue letter to Plaintiff for her disability discrimination claim. (See Docket No. 82-17.)  At some point Plaintiff contacted the EEOC to inform them about the retaliation claim. (See Docket Nos. 82-18; 82-19.) In order to include this claim, the EEOC sent two letters, both dated August 21, 2009, granting Plaintiff the right to sue for both her disability and retaliation claim.  (See id.)

**H.       Engagement in Interactive Process to Implement a Reasonable Accommodation**

Plaintiff submitted to an initial low level evaluation performed by Dr. Jorge Matos Malave ("Dr. Malave") in order to determine which job duties she could perform. (See Docket Nos. 96 at ¶ 97; 92-1 at ¶ 97.) Dr. Malave found that Plaintiff could perform and document mental evaluations of injured workers, and with vision aids she could read printed or electronic media, although extensive reading and small print forms would be difficult. (See Docket Nos. 96 at ¶ 98; 92-1 at ¶ 98.)  Specifically, Dr. Malave found that Plaintiff can interview workers, but cannot perform physical examinations of injured workers. (See id.) In a letter dated November 4, 2010, the director of the Labor Relations and Equal Employment Office asked Plaintiff to be evaluated a second time by Dr. Malave in order to identify any vision aides that may help Plaintiff on the job. (See Docket No. 91-3 at 103, L. 10-22.)  Plaintiff was never evaluated by Dr. Matos a second time. (See id. at 104, L. 6-12.)

**III.     Discussion**

**Civil No. 08-2264 (GAG)**                          8

In its motion for summary judgment, FSE argues Plaintiff cannot establish violations of the ADA because she cannot perform the essential functions of her job with or without reasonable accommodation, she has not suffered an adverse employment action, and she has not engaged in an interactive process in order to establish a reasonable accommodation.   FSE argues summary judgment in its favor of Plaintiff's retaliation claim is appropriate because Plaintiff fails to make a *prima facie* showing of retaliation and because she has failed to exhaust her administrative remedies. (See Docket Nos. 83 & 96.)  FSE argues the same or similar arguments for dismissal of all of Plaintiff's state law claims. (See id.)  The court will analyze each claim in turn.

A.      ADA Claim

The ADA prohibits discrimination against a qualified individual with a disability by reason of the individual's disability. See 42 U.S.C. § 12112(a).  A qualified individual is, "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." Id. at § 12111(8).  The law defers to the employer's judgment in determining essential functions of a job and allows written job descriptions to serve as evidence that particular functions are essential. See id.  Discrimination under the ADA is defined as, "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." Id. at § 12112(b)(5)(A).

The First Circuit requires Plaintiff to prove three factors by a preponderance of the evidence in order to make a failure to make reasonable accommodations claim under the ADA. See Colón-Fontánez v. Municipality of San Juan, 660 F.3d 17, 32 (1st Cir. 2011).  Plaintiff must show: (1) she was disabled within the meaning of the ADA; (2) she was qualified to perform the essential functions of the job, either with or without reasonable accommodation; and (3) the employer took an adverse employment action against her because of the alleged disability. See id.  Defendant argues that Plaintiff fails to establish the second prong of this test, because she is not a qualified person.  Accordingly, the court will proceed to determine whether the evidence of record raises a

**Civil No. 08-2264 (GAG)**                                    9

genuine issue of meterial fact as to said prong of the test.

In order to demonstrate her status as a qualified individual, the plaintiff must show she possesses the requisite skill, experience, education as well as the ability to perform the position's essential functions with or without reasonable accommodation. See id. at 32-33. Because FSE does not argue that Plaintiff lacks the requisite skill, experience or education to perform her job duties, the court's analysis is determined by her ability to perform the essential functions of the job, with or without reasonable accommodation. See Richardson v. Friendly's Ice Cream Corp., 594 F.3d 69, 75 (1st Cir. 2010).

An essential function is one that "bear[s] more than a marginal relationship to the job at issue." Colón-Fontánez, 660 F.3d at 33 (quoting Chandler v. City of Dallas, 2 F.3d 1385, 1393 (5th Cir. 1993)). The Code of Federal Regulations states a job function may be essential for several reasons, but specifically lists three as illustrative. See 29 C.F.R. § 1630.2(n)(2). Generally, essential functions are the, "fundamental job duties of the employment position the individual with a disability holds or desires." See id. at § 1630.2(n)(1). The three specific examples of what constitutes an essential function are: "(i) the function may be essential because the reason the position exists is to perform that function; (ii) the function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed; and/or (iii) the function may be highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function." See id. at § 1630.2(n)(2)(i-iii).

The employer bears the burden of demonstrating that a particular function is essential, while the plaintiff bears the burden of demonstrating that she is a qualified individual. See Richardson, 594 F.3d at 76 (citing Tobin v. Liberty Mut. Ins. Co., 433 F.3d 100, 107 (1st Cir. 2005); Laurin v. Providence Hosp., 150 F.3d 52, 59 (1st Cir. 1998)). The court's duty is to ensure the employer's asserted essential functions of the job are not mere fabrications. See Richardson, 594 F.3d at 76. While the employer's good-faith view regarding the essential functions of the job is not dispositive, it is given substantial weight by the court. See id. (citing Gillen v. Fallon Ambulance Serv., Inc.,

1    **Civil No. 08-2264 (GAG)**                    10

2    283 F.3d 11, 25 (1st Cir. 2002)); see also Mulloy v. Acushnet Co., 460 F.3d 141, 147 (1st Cir. 2006).

3           Additionally, the court does not consider any special arrangements made between the

4    employer and employee that lighten the job responsibilities for any particular employee.  See

5    Richardson, 594 at 78; Laurin, 150 F.3d at 60-61 ("An employer does not concede that a job function

6    is 'non-essential' simply by voluntarily assuming the limited burden associated with a temporary

7    accommodation . . .").  A voluntary accommodation made by an employer for an employee does not

8    change the court's analysis regarding the essential functions of the position.  See Richardson, 594

9    F.3d at 78 (holding reduction of employee's physical duties after injury is of minimal value and does

10   not change court's analysis).

11          In the present case, because Plaintiff was a Physician III during the relevant events, the court

12   will focus on the essential functions of being a Physician III in order to determine whether Plaintiff

13   is qualified for the position.  However, the court will analyze all the listed job functions because FSE

14   did not concede that any functions were non-essential by transferring Plaintiff to MUEC at her

15   request. See id.  FSE asserts Plaintiff cannot perform multiple essential job functions because of her

16   visual acuity. (See Docket No. 83 at 6.)  There are twenty duties listed for employees categorized

17   as Physician III. (See Docket No. 91-4.)  In her letter to human resources, Plaintiff stated she had

18   performed all of these duties for eighteen months, which allowed her to be reclassified as a Physician

19   III. (See id.)  Among a Physician III's duties are prescribing medication, providing intervention in

20   emergency cases at the emergency room when required, and filling out the discharge and disability

21   summary. (See id.)  Additionally, it is undisputed that physicians at FSE must evaluate patients that

22   arrive at the clinic, conduct physical inspections, and record any possible use of alcohol and/or

23   controlled substances by a patient. (See id. at 5; Docket Nos. 96 at ¶ 32; 92-1 at ¶ 32.)

24          FSE's judgment as to which duties are essential is taken into consideration by the court.  See

25   29 C.F.R. § 1630.2(n)(3)(1).  The job descriptions submitted by FSE are particularly important in

26   this case because they were written years before any dispute arose between FSE and Plaintiff. (See

27   Docket No. 91-4.)  Furthermore, Plaintiff used this description when seeking promotion from

28   Physician II to Physician III. (See id.)  Given that the court usually gives substantial weight to the

**Civil No. 08-2264 (GAG)**                                  11

written job descriptions of an employer and that the description of duties in this case was created

before litigation, there is no implication that FSE asserts that these duties are essential merely as an

excuse to discharge Plaintiff.  See 29 C.F.R. § 1630.2(n)(3)(ii); Richardson, 594 F.3d at 76.

Additionally, these duties are determined to be essential because there are a limited number of

employees who can perform the role of a physician.  The position of Physician III exists because a

physician must evaluate the patients entering the FSE and being a physician necessitates a high level

of education.  See 29 C.F.R. § 1630.2(n)(2) (listing these reasons as possibilities for a function to

be considered essential).

        Plaintiff's main argument, that medical examinations are not an essential function of the job,

is rebutted by this evidence.  Plaintiff cannot perform all essential functions of the job because she

cannot administer medical evaluations with or without a reasonable accommodation.  (See Docket

Nos. 96 at ¶¶ 43-46; 92-1 at ¶¶ 43-46.)  It is undisputed that Plaintiff cannot examine the lower body

of patients and cannot recognize certain abnormalities on a person's body.  (See id.)  As evidence

of Plaintiff's ability to perform the essential functions of the position, Plaintiff relies on the letter

written by Nicolas López ("López") stating that Plaintiff must perform all duties of a physician at

MUEC or face termination.  (See Docket Nos. 93 at 2; 92-2.[1])  Plaintiff's argument is that she must

have performed all the essential functions of the job because she was not terminated.  (See Docket

No. 92-2.)  However, the essence of this lawsuit is that Plaintiff was not performing all the  essential

functions of the job and FSE would like to require Plaintiff to perform all essential functions of the

position.  "An employer has no duty to modify an essential function of a job.  If the plaintiff, with

or without reasonable accommodation, cannot perform an essential function of the job, then he is

not a qualified individual and there is no duty to accommodate."  Calef, 322 F.3d at 86.  The

_____

        [1] The document at Docket No. 92-2 is a copy of the original letter written by López and sent
to Yejo.  However, the original copy is written in Spanish and no certified translation has been
submitted to the court as mandated by Local Rule 5(g).  However, for the purposes of this motion
for summary judgment, the contents of the letter do not create a genuine issue of material fact.
Therefore, the court will presume Plaintiff's attorney, as an officer of the court, correctly summarizes
the contents of the letter in Plaintiff's memorandum in opposition to summary judgment.

**Civil No. 08-2264 (GAG)**                    12

evidence in this case is clear, Plaintiff cannot perform examinations of patients, and performing

examinations are an essential function of the job.   Because she cannot perform all the essential

functions of the job, Plaintiff is not a qualified individual to be a Physician III at FSE.  See Colón-

Fontánez, 660 F.3d at 32.  No reasonable jury could find that Plaintiff was qualified for this position.

As Plaintiff has failed to establish the prima facie case for discrimination under the ADA, the court

**GRANTS** FSE's motion for summary judgment as to the discrimination claim.

### B.        Plaintiff's Retaliation Claim

Plaintiff's second claim asserts she was retaliated against due to the deposition testimony she

gave in the Heredia Case.  (See Docket No. 93 at 7.)

The court recognizes that an ADA plaintiff need not succeed on her ADA claim in order to

establish a claim for retaliation.  See Colón-Fontánez, 660 F.3d at 36.  In order to successfully

establish a retaliation claim, Plaintiff must show that: "(1) she was engaged in protected conduct;

(2) suffered an adverse employment action; and (3) there was a causal connection between the

protected conduct and the adverse action."  Id. (citing Carmona-Rivera v. Puerto Rico, 464 F.3d 14,

19 (1st Cir. 2006)).  In order to establish causality, Plaintiff bears the burden of showing a nexus

between the protected conduct and the alleged retaliatory act.  See Colón-Fontánez, 660 F.3d at 37.

Essentially, this nexus requires Plaintiff to show a colorable link between the protected conduct and

the adverse action.  See id.  This nexus can be demonstrated through temporal proximity, with closer

temporal proximity between the events demonstrating a stronger link.  See Clark County Sch. Dist.

v. Breeden, 532 U.S. 268, 273-74 (2001).  First Circuit precedent, along with persuasive precedent

from other circuits, has generally defined what amount of time between the protected activity and

the adverse action is too long.  See Colón-Fontánez, 660 F.3d at 37 (holding seven months between

requested accommodation and adverse action too long to support causal connection); Calero-Cerezo,

355 F.3d at 25 (noting period of three to four months too long to sustain causal connection based on

temporal proximity).  But see Mariani-Colon v. Dept. of Homeland Sec. ex rel. Chertoff, 511 F.3d

216, 224 (1st Cir. 2007) (holding two month gap between protected activity and adverse action close

enough to sustain causal connection).

**Civil No. 08-2264 (GAG)**                                    13

FSE contends the time between the testimony in the Heredia Case and the alleged discriminatory acts is too long allow a reasonable jury to infer a causal connection between the testimony and any potential adverse employment action. (See Docket No. 83 at 19.)  For the purposes of summary judgment, FSE has conceded that Plaintiff sought a reasonable accommodation and that she subsequently engaged in protected activity under the ADA. (See Docket No. 83 at 19.) Because failure to establish any one element of the *prima facie* case is sufficient for the claim to fail, the court will focus its discussion on the causal connection element.

Plaintiff argues her deposition testimony in the Heredia Case was prejudicial against Yejo and as a result of that, Yejo began a campaign to revoke Plaintiff's reasonable accommodation. (See Docket No. 93 at 7.)  Plaintiff's evidence relies on the temporal proximity between her testimony in the Heredia Case and the revocation of her reasonable accommodation. (See id.)  The thrust of Plaintiff's testimony in this case is that Plaintiff was given a reasonable accommodation in 2002, but Yejo began to demand Plaintiff perform additional duties that were not required under her reasonable accommodation beginning in April of 2007. (See id.)  While Plaintiff asserts these additional duties were required because of the Heredia Case testimony, Plaintiff's own deposition testimony for the present case does not support such a causal link.  Plaintiff cannot remember if she ever had to perform physical examinations of workers prior to December of 2006. (See Docket No. 91-2 at 17 L. 11-17.)  Plaintiff also cannot remember if she was ever required to cover the Employees Clinic prior to June or July 2006, the time prior to her testimony in the Heredia Case. (See Docket No. 91-3 at 9 L. 14-19.)  In all of Plaintiff's testimony, the only evidence before the court that could support the theory that Plaintiff was discriminated against due to her testimony in the Heredia Case is the temporal link between the two events.

The alleged discriminatory acts in this case began too long after Plaintiff's testimony in the Heredia Case to demonstrate a nexus with the alleged discriminatory acts. See Calero-Cerezo, 355 F.3d at 25.  Plaintiff's Heredia Case testimony occurred in June or July of 2006. (See Docket Nos. 96 at ¶ 63; 92-1 at ¶ 63.)  The alleged discriminatory acts began, at the earliest, five months after this testimony. (See Docket Nos. 96 at ¶¶ 66-67; 92-1 at ¶¶ 66-67.)  In this case, absent any other

**Civil No. 08-2264 (GAG)**                     14

evidence of record, a gap of five months between the protected activity and retaliatory events is too

long to support a causal connection for retaliation purposes.  See Calero-Cerezo, 355 F.3d at 25.

Because a causal connection between the protected activity and the adverse action is a necessary

element in establishing a *prima facie* retaliation case Plaintiff's retaliation claim must fail.

Therefore, the court **GRANTS** FSE's motion for summary judgment for Plaintiff's retaliation claim.

### C.      State Law Claims

#### 1.      Law 44

Law 44 is the state law version of the federal ADA statute.  The elements of a Law 44 claim

are essentially the same as an ADA claim.  See Perez Montero v. CPC Logistics, Inc., 536 F. Supp.

2d 135, 145 (D.P.R. 2008).  Having been modeled after the ADA, Law 44 also requires Plaintiff to

demonstrate she was a qualified individual.  See id.  In this case, Plaintiff has failed to demonstrate

she is a qualified individual under the ADA.  For the same reason, Plaintiff's Law 44 claim must also

fail.  The court **GRANTS** FSE's motion for summary judgment as to this claim.

#### 2.      Laws 69 and 100

Laws 69 and 100 serve nearly identical purposes and proscribe nearly identical behavior.  See

Garcia v. Sprint PCS Caribe, 2012 WL 28070 at *23 (D.P.R. Jan. 5, 2012).  Both laws, along with

Law 17, constitute a statutory scheme enacted to combat gender discrimination.  See id.  Plaintiff

voluntarily dismissed the claims of sex discrimination under Title VII (Docket No. 22).  Laws 69 and

100 are the state law correlates to this action.  Therefore, the court **DISMISSES** these claims as well.

#### 3.      Law 115 and Articles 1802 and 1803 of the Civil Code

"As a general principle, the unfavorable disposition of a plaintiff's federal claims at the early

stages of a suit, well before the commencement of trial, will trigger the dismissal without prejudice

of any supplemental state-law claims."  Rodriguez v. Doral Mortg. Corp., 57 F.3d 1168, 1177 (1st

Cir. 1995).  In cases where the federal claims are dismissed, "the balance of factors to be considered

under the pendent jurisdiction doctrine – judicial economy, convenience, fairness, and comity– will

point toward declining to exercise jurisdiction over the remaining state-law claims."  Id.  The use

of supplemental jurisdiction in these circumstances is completely discretionary, and is determined

**Civil No. 08-2264 (GAG)**                              15

on a case-by-case basis.  Id.  As all of Plaintiff's federal claims have been dismissed, the court, in

its discretion, **DISMISSES**, without prejudice, the remaining state law claims brought by Plaintiff.

**IV.     Conclusion**

      For the foregoing reasons, the court **GRANTS** FSE's motion for summary judgment at

Docket No. 82.


      **SO ORDERED**

      In San Juan, Puerto Rico this 8th day of February, 2012.

                                              *S/Gustavo A. Gelpí*

                                          GUSTAVO A. GELPÍ

                                    United States District Judge